COURTNEY BURTON,

                          Plaintiff,

      v.                             5:18-CV-150 (ATB)

MAMOUN ABRAHAM,

                          Defendant.

COURTNEY BURTON, Plaintiff, pro se
DANIEL CARLO BOLLANA, Asst. Corporation Counsel for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

### MEMORANDUM-DECISION and ORDER

This matter was referred to me for all proceedings and entry of a final judgment, in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 55, 59). Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that defendant Abraham violated plaintiff's federal constitutional rights during the course of, and after, his arrest on May 18, 2016. (Complaint ("Compl.") *generally*) (Dkt. No. 1).

### I.   <u>Procedural Background</u>

Plaintiff's complaint contained twelve causes of action. (Compl. at 7-8). The first five causes of action were against defendant Abraham. The first three causes of action alleged that defendant Abraham unlawfully arrested, searched, and maliciously prosecuted plaintiff. (Compl. First-Third Causes of Action). Plaintiff's Fourth and Fifth Cause of Action alleged that defendant Abraham violated plaintiff's Fourth Amendment rights relative to the search and seizure of plaintiff's car. (Compl. Fourth-Fifth Causes of Action). The next five causes of action mirror the first five, but were

alleged against then-Chief of the Syracuse Police Department, Frank Fowler. (Compl. Sixth-Tenth Causes of Action). The Eleventh and Twelfth Causes of Action allege wrongful imprisonment by each of the defendants. (Compl. Eleventh-Twelfth Causes of Action).

On May 15, 2018, the Honorable David N. Hurd, United States District Court Judge granted defendant Fowler's motion to dismiss plaintiff's complaint against him for lack of personal involvement pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 22). This order had the effect of dismissing the Sixth through Tenth and Twelfth Cause of Action, which were asserted against defendant Fowler alone. (*Id.*) On June 1, 2018, defendant Abraham filed an answer to the complaint. (Dkt. No. 24).

Presently before the court is defendant Abraham's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 46). In support of his motion, defendant Abraham has filed Exhibits A-D, including the transcript of a hearing before Syracuse City Court Judge James Cecile (Def.'s Ex. A); the application for, and accompanying search warrants for the first and second floor apartments at 309 Merriman Avenue in Syracuse New York (Def.'s Exs. B & C); and plaintiff's deposition in this case (Def.'s Ex. D). Plaintiff has not responded in opposition to defendant's motion, despite being informed of the consequences of such failure and despite being afforded two extensions of time to do so.[1] (Dkt. Nos. 47, 56, 57, 58).

---

[1] Plaintiff asked for an extension of time to respond shortly after defendant filed his motion. (Dkt. No. 47). Defense counsel filed a letter brief on October 28, 2019, enclosing the Notice of Consequences, which were also served on plaintiff on October 28, 2019. (Dkt. Nos. 56, 57). The Notice of Consequences includes the warning that if plaintiff fails to respond to the defendant's motion, the court may deem defendant's factual statements to be true and plaintiff's claim may ultimately be dismissed in the appropriate case. (*Id.*) Based on defendant's submission, and in an

## II.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the party opposing summary judgment does not respond to the motion, the court may "grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show

abundance of caution, the court sua sponte granted plaintiff another extension of time to respond to defendant's motion. (Dkt. No. 58).  This extension expired on December 2, 2019. (*Id.*)  To date, plaintiff has neither responded to the motion, nor has he requested an extension of time to do so.  Thus, the court will proceed to consider the defendant's motion.

that the movant is entitled to it." *DeJesus-Hall v. New York State Unified Court*, No. 18-CV-1241, 2020 WL 978517, at *5 (S.D.N.Y. Feb. 27, 2020) (Fed. R. Civ. P. 56(e)(3)). Where the non-moving party willfully fails to respond to a motion for summary judgment, the court has no duty to perform an independent review of the record to find proof of a factual dispute, even if the non-moving party is pro se. *Gray v. Coeyman's Police Dep't*, No. 1:16-CV-1239, 2020 WL 871179, at *5 (N.D.N.Y. Feb. 21, 2020). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III. <u>Facts</u>

The court will briefly review the facts as stated in the complaint as well as the facts as developed through further discovery and currently unopposed by plaintiff.[2] In his complaint, plaintiff alleged that on May 18, 2016, at approximately 1:00 pm, defendant Abraham "without a warrant, probable case, or reasonable suspicion, unlawfully entered upon the premises of the Plaintiff . . . using excessive force in the form of pointed a loaded pistol firearm" at his head, "forcing him to get on the ground, handcuffing him, searching his entire person, and removing him to another location (the driveway of 309 Merriman Avenue) against his will." (Complaint ("Compl." at 4).

Plaintiff claimed that, after he lay on the ground for nearly two hours, handcuffed with his hands behind his back, defendant Abraham transported him to the Onondaga

---

[2] The allegations of fact in the complaint are different than the testimony that plaintiff gave during his deposition, and different than the facts articulated by the officers during the state court probable cause/dismissal hearing.

County Justice Center, where defendant Abraham filed a "false criminal complaint against Plaintiff charging him with possession of a Controlled Substance in the 3rd and 7th degree as well as loitering." (*Id.*) Plaintiff states that these charges were filed "despite the fact that the search of Plaintiff did not yield any items of criminality." (*Id.*)

Plaintiff also alleged that defendant Abraham was responsible for seizing, driving away, and impounding plaintiff's car. (Compl. at 4-5). Plaintiff stated that the car was impounded for two months, the windows were left open, and the car was substantially damaged before it was returned. (Compl. at 5). As a result of defendant Abraham's actions, plaintiff alleged that he was falsely incarcerated for seven months before the charges were "resolved in the Plaintiff's favor on December 2, 2016." (*Id.*)

Plaintiff was deposed in this action on May 24, 2019. (Dkt. No. 46-5) ("Pl.'s Dep.") Plaintiff testified that on May 18, 2016, he was on parole and living at 302 Merriman Avenue. (Pl.'s Dep. at 18-19). Plaintiff testified that he went to "Parole" on the morning of May 18, and he was given an "ankle bracelet" to wear because he was late for his curfew the week before. (Pl.'s Dep. at 27). Plaintiff testified that when he got back from his parole visit, he pulled up in front of his house at 302 Merriman Avenue, and as he got out of the car, he saw "the guys" who "got raided," and "they" were bringing out four wheelers and dirt bikes from a garage behind the house. (Pl.'s Dep. at 28-29, 30). Plaintiff stated that, usually he did not go over to 309 Merriman when invited, but he did this time, because he saw a dirt bike like the one that he used to own. (Pl.'s Dep. at 29).

Plaintiff testified that he spoke with someone who offered plaintiff a ride on the

bike. (Pl.'s Dep. at 29-30). Plaintiff stated that "they" brought the bikes outside of the fence, making sure to emphasize that he "never" set foot inside of the fence. (Pl.'s Dep. at 30). Plaintiff stated that this conversation took place in front of 307 Merriman Avenue. (Pl.'s Dep. at 31). Plaintiff "took [the bike] around the block." (*Id.*) Plaintiff testified that as he got off the bike, and began walking back toward 302 Merriman Avenue, he heard "the guy" saying that he locked his keys in "the car." (Pl.'s Dep. at 32). Although plaintiff did not know the individual's name at the time, after plaintiff was arrested, he discovered that the individual's name was Abimael Rodriguez. (*Id.*)

Plaintiff testified that Mr. Rodriguez was standing behind a car, parked in front of 311 Merriman Avenue and that he was "ranting and raving" about having locked his keys in the trunk. (Pl.'s Dep. at 32-33). Plaintiff stated that he turned around and noticed that the car's sun roof was open, and he heard Mr. Rodriguez say that he was going to have to call a locksmith. (Pl.'s Dep. at 33). As plaintiff walked back toward Mr. Rodriguez, plaintiff told Mr. Rodriguez that if he got plaintiff a clothes hanger, he would help him unlock the door, let the back seat down, and "fish the keys out." (Pl.'s Dep. at 33-34).

Plaintiff waited at the car while Mr. Rodriguez went to get a clothes hanger, which took between two and four minutes. (Pl.'s Dep. at 36-37). Plaintiff stated that there were "a lot of people outside," but that he just stood by himself at the car and did not speak with anyone. (*Id.*) Mr. Rodriguez returned with the hanger, and plaintiff described how he helped Mr. Rodriguez retrieve his keys. (Pl.'s Dep. at 37). Plaintiff testified that as he gave Mr. Rodriguez his keys, he heard some one talking about a U-

Haul truck. (Pl.'s Dep. at 38). Plaintiff stated that as he turned around, he saw the U-Haul truck pass by, and it "went right in front of us." (*Id.*) Plaintiff stated that as he watched, the back of the U-Haul opened, he saw a "lot of cops run out," and they "all attacked the location." (*Id.*) Plaintiff stated that some people ran and some people stayed there, but "they were getting beat down to the ground." (*Id.*)

Plaintiff watched for a "second" and realized that this was "an actual raid." (Pl.'s Dep. at 41). Plaintiff then testified that "[a]ll I did was walk right across the street. I didn't run. I didn't try to get away. I wasn't doing anything wrong. I felt like I wasn't doing anything wrong, but, I guess I was associating with this guy who was actually being targeted with this investigation." (*Id.*) Plaintiff stated that he was happy that no drugs were found in the car because he was worried that if "they found anything in there" they would "think that I had something to do with it." (Pl.'s Dep. at 42).

Plaintiff testified that, after he watched for a short time, he "snapped back into it," and "just walked across the street" toward his own home. (Pl.'s Dep. at 43). Plaintiff stated that the raid caused a lot of attention, and a lot of people began "coming around." (*Id.*) There were a lot of people on the sidewalk. Plaintiff testified that as he was walking toward his house, he heard a truck behind him, and as plaintiff reached his driveway, defendant Abraham jumped out of the truck. (Pl.'s Dep. at 44). Plaintiff states that he turned around, and he was face to face with defendant Abraham, who allegedly had his gun out and told plaintiff to "freeze" and "get on the ground." (Pl.'s Dep. at 45). Plaintiff stated that he complied with the defendant's order. (*Id.*)

Plaintiff testified that defendant Abraham came over to him, told him to put his

hands behind his back, put the handcuffs on him, and helped him stand up. (Pl.'s Dep. at 46). Plaintiff stated that defendant Abraham then asked plaintiff whether he had anything on him, drugs, weapons, "anything going to poke me?" (*Id.*) Plaintiff said no, and defendant Abraham patted him down, and " he [felt] the ankle bracelet." (Pl.'s Dep. at 47). Plaintiff told defendant Abraham that he was on parole, and explained that he lived at 302 Merriman, and that he was "never over there." (*Id.*) When defendant Abraham confronted plaintiff about "just walking over from . . . there," plaintiff explained that he was helping Mr. Rodriguez get his keys out of the car. (Pl.'s Dep. at 48). Plaintiff tried to explain that he did not know anyone from 309 Merriman, but defendant Abraham told plaintiff that he was still going to bring him over there "to see what you know." (Pl.'s Dep. at 48-49).

Plaintiff testified that defendant Abraham brought him back to 309 Merriman, brought plaintiff "inside the fence," and sat him on the grass with all the other individuals in handcuffs. (Pl.'s Br. at 49). Plaintiff states that as he was sitting on the ground, he stopped a sergeant who was walking by, and explained that he did not know how he got over there. (*Id.*) According to plaintiff, the sergeant had an officer come over to pat plaintiff down again, but told him that if they didn't find anything in the car, they would let him go. (Pl.'s Dep. at 50).

However, instead, plaintiff was brought into the house and strip searched, but plaintiff does not allege that defendant Abraham was involved in this search. (Pl.'s Dep. at 54-55). Plaintiff never saw anyone search the car that was in front of 311 Merriman. (Pl.'s Dep. at 56). He testified that the police were already towing cars

away. (Pl.'s Dep. at 57). Plaintiff testified that his own car was driven away. (*Id.*) The car was a 1996 Lincoln Town Car with Alabama licence plates. (Pl.'s Dep. at 58-59). The car was parked in front of 302 Merriman and was registered to plaintiff's mother. (Pl. Dep. at 59). Plaintiff testified that, after he was strip searched and his belongings were returned to him, two other officers found the "key fab [sic]" of his car. (Pl.'s Dep. at 61- 63). They unlocked the car and began to search it. (Pl.'s Dep. at 63). However, defendant Abraham was not involved in either taking the "keys" or the search of plaintiff's car. (Pl.'s Dep. at 63, 65). After searching the car, the officers drove away with plaintiff's car. (Pl.'s Dep. at 65). Plaintiff was ultimately taken and "booked" at the Onondaga County Justice Center, where plaintiff called his mother so that she could get "money up." (Pl.'s Dep. at 66). Plaintiff then described all the damage that was done to the car between May and when it was returned to her at the end of July 2016. (Pl.'s Dep. at 67-68).

Plaintiff testified that he discussed his case with an attorney and asked him to "put in a motion to dismiss." (Pl.'s Dep. at 70). However, plaintiff's attorney allegedly told plaintiff that he was arrested while he was on parole so "they have six months to indict you." (Pl.'s Dep. at 71). Plaintiff testified that he began to do his own research and made various determinations about the validity of his confinement. (Pl.'s Dep. at 72-73). Plaintiff stated that he contacted the Citizens' Review Board, which "came in" August 16th." (Pl.'s Dep. at 74). Plaintiff's charges were ultimately dismissed on December 2, 2016. (Pl.'s Dep. at 76-77). However, plaintiff was not released until

December 23, 2016 because he had to have a parole hearing.[3] (Pl.'s Dep. at 77-78).

Defendant has also filed the transcript of a December 2, 2016 hearing held before the Honorable James H. Cecile, Syracuse City Court Judge. (Dkt. No. 46-2) (Probable Cause Hearing ("PCH"). Judge Cecile stated at the beginning of the hearing that it was "really, a probable cause hearing as to the circumstances surrounding Mr. Burton's arrest, as well as the issue of the constructive possession." (PCH at 3). Witnesses at this hearing included: SPD Detective Scott Henderson (PCH at 4-13); SPD Detective Matthew MacDerment (PCH at 13-24), defendant Abraham (PCH at 24-30), and SPD Officer Jerry Mosqueda (PCH at 30-34).

Detective Henderson testified that he worked with the special investigation division, narcotics section. (PCH at 4). He testified that on May 18, 2016, he was the "case detective" for a narcotics and weapons investigation involving both the first and second floor apartments at 309 Merriman Avenue. (PCH at 5). The investigation had been ongoing for several months, during which information was gathered "relative to narcotics, sales from the location from parties gathering around the location on the property, as well as possession of weapons by those parties." (*Id.*) Detective Henderson testified that controlled purchases were made from individuals who were at the property. (*Id.*) During "street level investigation," individuals were stopped after purchasing the drugs and leaving the location. (PCH at 6). 309 Merriman was known as a "purchase point" for both heroin and cocaine. (*Id.*)

Detective Henderson testified that "daily," throughout the day, individuals

---

[3] Three months later, plaintiff was charged with an unrelated shooting and was convicted after a jury trial. (Pl.'s Dep. at 79-80). Plaintiff is currently incarcerated on those unrelated charges.

gathered "on and around" the property, including the driveway and yard area. (*Id.*)
Some individuals acted as "lookouts," some would "actually hold the narcotics," some
individuals would be using the drugs, and some would possess firearms for protection
at the location. (*Id.*) Detective Henderson used the information gathered from the
investigation to apply for a search warrant for the property. (*Id.*) A copy of the
application as well as the resulting search warrants, signed by Judge Cecile have been
included as exhibits in this case. (Def.'s Exs. B & C) (Dkt. Nos. 46-3, 46-4). The
search warrants were executed on May 18, 2016. (*Id.*)

Detective Henderson testified that, prior to the execution of the search warrants,
surveillance was established at the location, and eventually, the SWAT Team was
dispatched to the address. (PCH at 7). During the execution of the warrants, numerous
individuals were taken into custody both on the property, around the property, and
inside the residence. (*Id.*) The officers recovered "amounts of heroin, as well as
cocaine" in multiple spots throughout the property. (*Id.*) One individual who fled on
foot was found with heroin and a firearm. (*Id.*) Drug paraphernalia and packaging was
found throughout the property inside and outside the home, including in garbage cans.
(*Id.*) Detective Henderson stated that, over the course of the operation, approximately
15 people were arrested, including people who were leaving the property after
purchasing drugs. (PCH at 9). Plaintiff was one of those arrested as a result of the
execution of the search warrants. (*Id.*) On cross-examination, Detective Henderson
testified that a bundle of bags of heroin was found in the middle of the front yard, as if
someone had discarded it. (*Id.* at 11).

Detective MacDerment testified that he was the U-Haul driver in the "takedown at 309 Merriman Ave." (PCH at 15). The officers used a U-Haul rather than marked vehicles so that the officers could go undetected, giving them time "to get a little closer before people realize what's going on." (PCH at 13). Detective MacDerment testified that, on March 18th, "there was radio communication before we ever started down the street as far as the number of people who were out and what they had been doing." (PCH at 15). There were individuals in front of the house and in the driveway. (*Id.*)

Detective MacDerment testified that the radio communications also described a Toyota parked in front of the house, and surveillance had reported that "people were moving from the – yard, the driveway, back and forth between the car and that the car was definitely involved with the people there at 309 Merriman." (H at 15-16). Although Detective MacDerment did not see the vehicle before he arrived at the scene, he was advised by radio that people had been moving back and forth from the vehicle. (PCH at 17). Detective MacDerment testified that he drove past the Toyota and parked in front of it. (*Id.*) At that time, Detective MacDerment did observe the plaintiff come from the driveway to the passenger side of the vehicle. (*Id.*)

Detective MacDerment testified that when the doors of the U-Haul opened and the officers came out, there was "quite a bit of confusion[]." (PCH at 18). People were being taken into custody in front of the house and in the driveway. (*Id.*) Detective MacDerment stated that he observed the plaintiff leave the car, "trying to melt into the background and walk away along with the driver."[4] (*Id.*) Detective MacDerment

---

[4] Shortly thereafter, Detective MacDerment reiterated that "I saw the gentlemen come from the sidewalk to the car . . . as I overtook it. And then, when I got out of the car, I saw them exiting the car,

testified that he sent defendant Abraham and two other officers to apprehend plaintiff and the other individual. (*Id.*) Detective MacDerment watched as defendant Abraham and the two other officers "made contact" with the individuals, but then went onto something else. (*Id.*)

Defendant Abraham testified that he was a detective with the gang violence task force. (PCH at 24). On May 18, 2016, defendant Abraham was assigned with Detective Bailey from the Sheriff's Special Investigations Unit to the "takedown vehicle." (PCH at 25). This meant that defendant Abraham was assigned to assist in taking into custody those individuals who were fleeing or leaving the scene. (*Id.*) Defendant Abraham testified when they arrived, Detective MacDerment told them that there were two males walking away from the scene who were "involved." (PCH at 25-26). One of those individuals was plaintiff Burton. (PCH at 26).

The other individual was taken into custody by Detective Bailey. (PCH at 27). Defendant Abraham testified that he "then walked over to Mr. Burton, who was taken into custody without incident." (*Id.*) The individuals were a few houses west of 309 Merriman. (PCH at 29). Although he was involved in the arrest process, defendant Abraham did not recall whether he actually searched the plaintiff himself. (PCH at 27). On cross-examination defendant Abraham testified that he was not sure that he searched plaintiff himself, other than making sure that he was not armed. (PCH at 29). After that, plaintiff was escorted back to 309 Merriman, where "the" search was conducted. (*Id.*) He could not recall whether he conducted, or was even involved in,

---

basically trying to slink away." (PCH at 19). One of those individuals was the plaintiff. (*Id.*)

the search back at the residence. (PCH at 30).

The last detective to testify was Jerry Mosqueda.  He was in the "perimeter" unit, which included apprehending any individuals who attempted to run away. (PCH at 32). Detective Mosqueda testified that he did not take any people into custody that day. However, during his search of the fenced-in front yard of 309 Merriman, he located a bundle of ten glassine envelopes of heroin wrapped with a rubber band.[5]  The bundle was laying in the front yard. (*Id.*)

At the probable cause hearing, plaintiff's criminal attorney argued that the People were trying to establish "constructive possession" of the drugs, presumably the heroin found in the yard. (PCH at 34).  Counsel pointed out that no drugs were found on the plaintiff's person. (PCH at 34).  Counsel concluded by arguing that in order to show constructive possession, the "defendant" must be near the drugs to establish that he "had control to possess the controlled substances." (PCH at 35-36).  After allowing the prosecutor to make his argument, Judge Cecile found that there was probable cause to arrest plaintiff.  However, based on the evidence at the hearing, the prosecution would not be able "to sustain their burden of proof with respect to constructive possession at trial." (PCH at 37).  Judge Cecile then dismissed the criminal charges against plaintiff. (PCH at 37-38).

## IV.  **Collateral Estoppel**

### A.  **Legal Standards**

The doctrine of collateral estoppel provides that once a court has actually and

---

[5] The substance in the envelopes field tested positive for heroin. (PCH at 33).

necessarily decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue on a different cause of action involving a party to the first case. *Rivera v. United States*, No. 3:10-CV-1970, 2012 WL 3043110, at *2 n.5 (D. Conn. 2012) (discussing collateral estoppel) (citations omitted). Federal courts must accord state court judgments the same issue and claim preclusion to which they would be entitled in state court. *Pappas v. Giuliani*, 118 F. Supp. 2d 433, 439 (S.D.N.Y. 2000) (citation omitted).

Collateral estoppel is applicable under New York law if (1) the identical issue was decided in the prior action and was decisive of the present action; and (2) the party against whom preclusion is sought had a full and fair opportunity for litigation in the prior proceeding. *Jenkins v. City of New York*, 487 F.3d 76, 85 (2d Cir. 2007) (citing *Juan C. v. Cortines*, 89 N.Y.2d 659, 667 (1997)).

**B.    Application**

Defendant argues that plaintiff is precluded by collateral estoppel from relitigating his false arrest/imprisonment and malicious prosecution claims because Judge Cecile found after a hearing, that the officers had probable cause to arrest plaintiff. Defendant cites *Reyes v. City of New York*, No. 10-CV-1838, 2012 WL 37544 at *4 (E.D.N.Y. Jan. 9, 2012) which held that Mr. Reyes was barred by collateral estoppel from relitigating the legality of his arrest when the issue was decided against him in a pre-trial motion in state court, even though plaintiff was later acquitted by a jury. (Def.'s Mem. of Law at 2-3).

The court notes that in *Reyes*, at the beginning of the decision, when outlining the

facts of the case, the court mentioned that the plaintiff had been acquitted by a jury. The issue of the plaintiff's acquittal was not discussed in the collateral estoppel analysis. The court in *Reyes* found that plaintiff had a full and fair opportunity to litigate the issue of probable cause because he participated in a state court suppression hearing, during which the officers testified, and after which, the trial court judge issued a decision. 2012 WL 37544, at *2, *4.

The case cited by defense counsel contradicts a much more recent case from the Eastern District of New York, which relied on a Second Circuit case in finding that facts determined in a pre-trial suppression hearing ***cannot*** be given preclusive effect against an individual who is subsequently acquitted of the charges. *Daniel v. Orlando*, No. 16-CV-1418, 2019 WL 1791517, at *4 (E.D.N.Y. Apr. 24, 2019) (citing *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996)). In *Daniel* the court specifically stated that

> [a]lthough the question of whether probable cause supported Plaintiff's arrest was necessarily decided at the state-court suppression hearing and is decisive in adjudicating Plaintiff's false arrest claim, Plaintiff did not have a full and fair opportunity to contest the probable cause determination in state court because the charges against her were ultimately dismissed.

2019 WL 1791517, at *4.

The court in *Daniel* reasoned that if plaintiff's charges were dismissed, she would not have had the "opportunity" to appeal the state court's adverse determination on the probable cause issue because there was insufficient incentive to do so. *Id.* In *Johnson*, the court held that under New York law, "appellate review plays a critical role in safeguarding the correctness of judgments." 101 F.3d at 795 (citing *Malloy v.*

16

*Trombley*, 50 N.Y.2d 46, 51 (1980)). Collateral estoppel cannot be applied without first considering the availability of such review. *Id.* If the party has not had an opportunity to appeal the adverse finding, then "it has not had a full and fair opportunity to litigate the issue." *Id.* (citations omitted). The court in *Johnson* then cited several New York State cases in which the state court held that facts determined in a pre-trial suppression hearing could not be given preclusive effect against a defendant who was subsequently acquitted of the charges because the defendant lacked the opportunity to obtain review of the issue decided against him. *Id.* (citing inter alia *Williams v. Moore*, 197 A.D.2d 511, 513 (2d Dep't 1993); *People v. Howard*, 152 A.D.2d 325, 329 (2d Dep't 1989), *appeal denied*, 75 N.Y.2d 814 (1990); *People v. Sweeper*, 127 A.D.2d 507, 509 (1st Dep't 1987)).

In this case, Judge Cecile first found that the officers had probable cause to arrest the plaintiff, but ultimately dismissed the charge of constructive possession for lack of evidence. The court found probable cause and dismissed the charges all in the same proceeding. There clearly was no opportunity for the plaintiff, nor was there any incentive for the plaintiff to appeal the adverse probable cause determination. Thus, collateral estoppel does not apply in this case to prevent re-litigation of the probable cause issue. However, as will be discussed below, notwithstanding the unavailability of collateral estoppel, plaintiff's claims may still be dismissed.

## V.     **False Arrest/False Imprisonment**

### A.     **Legal Standards**

In analyzing § 1983 claims for unconstitutional false arrest, the court looks to the

law of the state in which the arrest occurred. *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (citing *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). Under New York law, a false arrest claim requires a plaintiff to show that "the defendant intentionally confined him without his consent and without justification." *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) and citing *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Reid v. Yisrael*, No. 19-CV-1220, 2019 WL 2437848, at *2 (E.D.N.Y. June 10, 2019) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (quotations omitted) and citing *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) ("Probable cause is a complete defense to a constitutional claim of false arrest and false imprisonment." (citations omitted)).

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d at 152 (quotation omitted). The existence of probable cause must be based on the totality of the circumstances. *Turyants v. City of New York*, No. 18-CV-841, 2020 WL 804900, at *4 (E.D.N.Y. Feb. 18, 2020) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)). In addition, the "collective knowledge doctrine" provides that, "for the purpose of determining whether an arresting officer had probable cause to arrest,

"'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5 (1983)). However, the arresting officer must have acted reasonably in relying on the information communicated to him. *Husbands ex rel Forde v. City of New York*, 335 Fed. App'x 124, 128 (2d Cir. 2009) (citation omitted). Furthermore, the fact that the criminal charges are subsequently dismissed is not relevant to the determination of probable cause to arrest. *Danforth v. City of Syracuse*, No. 09-CV-307, 2012 WL 4006240, at *7 (N.D.N.Y. Sept. 12, 2012).

### B. Application

In this case, a review of the testimony at plaintiff's state court hearing, plaintiff's own testimony at the deposition in this action, and the documents associated with the search warrant applications in state court show that defendant Abraham had probable cause to arrest the plaintiff on May 18, 2016, even if the charges against him were later dismissed.[6]

There is no question, and plaintiff never disputed, that 309 Merriman Avenue was the center of a drug dealing organization. Detective Henderson outlined the investigation, both in his application for warrants to search the house and surrounding areas, and at plaintiff's probable cause hearing. (Def.'s Ex. C at 4-8). As stated above,

---

[6] As stated above, plaintiff has failed to respond to the defendant's motion for summary judgment, despite being warned about the consequences. Thus, plaintiff has essentially admitted the facts as stated by the defendant. During his deposition, plaintiff admitted to some of the facts that the defendant alleges. The court will then determine if defendant has shown that he is entitled to judgment as a matter of law based on those facts.

Detective Henderson testified at the plaintiff's hearing that the investigation lasted several months prior to the execution of the search warrants in question on May 18, 2016. (PCH at 5). In the search warrant application, and at the hearing, Detective Henderson described various controlled purchases of narcotics at 309 Merriman and also stated that, based on previous investigations, it was known that the responsible individuals would conceal drugs in "extremely unusual locations," including locations inside the home, outside the home, and in vehicles located on the property. (Def.'s Ex. C at 8; PCH at 5-6).

Without detailing each observation, purchase, and arrest that lead to law enforcement's activities on May 16, 2016, it is clear that there was substantial narcotics trafficking from both apartments located at 309 Merriman Avenue, and that people who were involved in this trafficking would be located inside and outside the home. This included police observation that individuals would gather in and around the property in the driveway and the yard "areas," where some people would act as lookouts, others would hold onto the drugs, and others would be responsible for protecting the location. (Def.'s Ex. C at 5; PCH at 6). Based on this information, Judge Cecile issued the search warrants for the property. (Def's Ex. B).

Detective Henderson testified that prior to the execution of the search warrants, surveillance of the property was established, and ultimately, a SWAT team was dispatched to the location. (PCH at 7). Detective Henderson also stated that, during the execution of the warrants, heroin and cocaine were found in "multiple spots throughout the property," inside and outside the location. (*Id.*) Detective Henderson also testified

that one of the individuals who fled the location was discovered with drugs and a firearm. (*Id.*)  A bundle of bags with heroin in them was found abandoned in the front yard.

Detective MacDerment, who was driving the U-Haul, testified at plaintiff's state court hearing that the surveillance team described the Toyota that was parked in front of the house, and that people were moving "from the – yard, the driveway, back and forth and that the car was definitely involved with the people there at 309 Merriman." (H at 15-16).  The Toyota was parked "maybe a car length and a half west of the driveway" at 309 Merriman. (PCH at 20) (cross-examination).  Detective MacDerment observed the plaintiff go from the driveway of 309 Merriman to the passenger's side of the Toyota. (PCH at 17).  Before he got out of the U-Haul, Detective MacDerment observed a different individual running away, so the officers "addressed that first." (PCH at 18).  There was a bit of confusion as the officers took into custody individuals who were in front of the house and in the driveway. (*Id.*)  When Detective MacDerment got out of the U-Haul, he observed the plaintiff leaving the car, trying to "melt into the background" and walk away along with the driver." (PCH at 18).  He ordered defendant Abraham and another officer to apprehend plaintiff and the other individual. (*Id.*)

Based on the general investigation of the area, together with Detective MacDerment's observations, and the fact that drugs were found in the front yard of 309 Merriman, defendant Abraham had probable cause to stop and arrest the plaintiff, who according to Detective MacDerment had moved from the driveway of 309 Merriman, to the passenger side of the Toyota (which was reportedly being used in conjunction with

the activities at 309 Merriman), and who then attempted to walk away from the scene unnoticed.

Plaintiff's own testimony at his deposition, supports the officers' testimony. Plaintiff conceded at his deposition, that he went over to the Toyota and stood by the passenger door, allegedly to help the owner of the car get his keys out. Plaintiff testified that he stood by the car waiting for the owner to get a hanger, and then when the officers started arresting people, attempted to casually walk away from the car. (Pl.'s Dep. at 36-41). Defendant Abraham was assigned to assist in apprehending individuals who were attempting to flee or to get away from the scene (PCH at 25), and he was told by Detective MacDerment to apprehend the plaintiff and the other individual who had been next to the Toyota. Plaintiff was taken into custody without incident.[7] (PCH at 27). While no contraband was found on plaintiff, there were drugs found in the yard of 309 Merriman which had apparently been discarded by someone. Defendant Abraham brought plaintiff back to 309 Merriman and placed him where the rest of the detained individuals were sitting. (PCH at 29). He could not remember whether he was involved in the search of plaintiff. (PCH at 30). Based on the totality of the circumstances and the collective knowledge doctrine, this court agrees that there was probable cause to arrest plaintiff. Defendant Abraham acted reasonably in relying on the information provided by Detective MacDerment, when he took plaintiff into

---

[7] Although plaintiff testified at his deposition that defendant Abraham approached him in or around plaintiff's driveway at 302 Merriman with his gun drawn, plaintiff testified that he got on the ground, defendant Abraham came over, put handcuffs on him and "helped" him up. (Pl.'s Dep. at 45-46). Plaintiff testified that defendant Abraham then asked if plaintiff had anything on him and patted him down. (Pl.'s Dep. at 46). Defendant Abraham allegedly felt the plaintiff's ankle bracelet and inquired about it. (*Id.* at 47).

custody during the raid.

Plaintiff does not question any of the surrounding facts. In his deposition, plaintiff admitted being in the area right before the raid, riding a dirt bike that some individuals had taken out of the garage at 309 Merriman Ave, and standing by the Toyota for several minutes while Mr. Rodriguez went to get a hanger. He remembered the U-Haul van drive by the Toyota and park in front of it, and he remembered seeing all the officers jump out of the U-Haul.[8] In fact, at his deposition, plaintiff testified that "I felt like I wasn't doing anything wrong, but I guess, I was associating with this guy who was actually being targeted with this investigation."[9] (Pl.'s Dep. at 41).

Because probable cause to arrest plaintiff existed, plaintiff's claims for false arrest/imprisonment must be dismissed.[10]

## VI.   Qualified Immunity

### A.    Legal Standards

The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[8] As stated above, this testimony was completely contrary to the facts that plaintiff wrote in his complaint, where he stated that defendant Abraham "entered upon the [plaintiff's] premises," pointed a loaded gun at him, and arrested him, searching his entire person. (Compl. at 4).

[9] The court notes that plaintiff also claims to have had a discussion with former Police Chief Fowler while plaintiff was sitting at 309 Merriman with the rest of the individuals who had been taken into custody. However, Chief Fowler has been terminated from this action. (Pl.'s Dep. at 51-52).

[10] Although plaintiff alleged during his deposition that he was taken by officers into the house at 309 Merriman Avenue and strip searched, he specifically stated that defendant Abraham was not involved in that search. (Pl.'s Dep. at 54-56).

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining if a particular right was clearly established, the Court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *K.D. ex rel Duncan v. White Plains School Dist*., No. 11 Civ. 6756, 2013 WL 440556, at *10 (S.D.N.Y. Feb. 5, 2013) (citing *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)).

Because qualified immunity is "'an immunity from suit rather than a mere defense to liability,'" the Supreme Court has "'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (citations omitted). In the case of probable cause, the Second Circuit has held that an officer is entitled to qualified immunity if he can show "arguable probable cause" for the arrest. *Crenshaw v. City of Mt. Vernon*, 372 F. App'x 202, 205 (2d Cir. 2010). "Arguable probable cause ... exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Id.* (quoting *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (per curiam) (other quotations omitted)). In deciding whether arguable probable cause existed, the court examines whether "'(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New*

*Haven*, 950 F.2d 864, 870 (2d Cir.1991)) (internal quotation marks omitted)).  Even in situations in which an officer reasonably but mistakenly concludes that probable cause exists, "'the officer is nonetheless entitled to qualified immunity.'" *Id.* (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).

### B.    Application

Based on all the information above, even assuming that probable cause did not exist, the defendant would have had at least arguable probable cause to stop plaintiff, take him into custody, pat him down for weapons, and bring him back to 309 Merriman for further investigation.  Thus, plaintiff's claims for false arrest/imprisonment may be dismissed.

## VII.  **Malicious Prosecution**

### A.    Legal Standards

The elements of a malicious prosecution claim under both section 1983 and New York State law are: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice[,] and[ ] (4) the matter terminated in plaintiff's favor." *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016).  When raising a malicious prosecution claim under section 1983, the plaintiff must also show a "'seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (internal quotation marks and citation omitted)).

25

**B.     Application**

In this case, the court has found that defendant had probable cause to arrest the plaintiff.  This alone would defeat plaintiff's claim of malicious prosecution.  However, it is also unclear who filed the charges against plaintiff, and there is no indication in the facts that defendant Abraham filed the charges.  Therefore, it is likely that defendant Abraham did not even "initiate the prosecution" as required to establish malicious prosecution.  He was only involved in plaintiff's apprehension based on Detective MacDerment's observations.  In any event, there is no indication that the charges were filed with "malice," sufficient to establish a claim for malicious prosecution.  Thus, plaintiff's claim for malicious prosecution against defendant Abraham must be dismissed.

**VIII. <u>Personal Involvement</u>**

**A.     Legal Standards**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

**B.     Application**

In the complaint, plaintiff's second cause of action alleged that defendant Abraham unlawfully searched plaintiff and his fourth and fifth cause of action alleged that defendant Abraham unlawfully seized and searched plaintiff's car. (Compl. at 7).  However, during plaintiff's deposition, he conceded that defendant Abraham only patted him down at the time of his arrest.  Plaintiff specifically stated that defendant

Abraham was not involved in any of the other "searches" to which he was subjected. (Pl.'s Dep. at 54). Finally, plaintiff testified that defendant Abraham was not involved in the seizure, search, or damage to his car. (Pl.'s Dep. at 62, 63, 65). Plaintiff stated that two other officers took his keys and drove his car from the scene. (*Id.*) "It wasn't Abraham." (*Id.* at 62). Plaintiff repeated this twice. (*Id.* at 62, 63, 65). Plaintiff's own testimony makes it quite clear that, even assuming that there were a Fourth Amendment violation associated with the search and seizure of plaintiff's car, defendant Abraham was not involved. Thus, plaintiff's Fourth and Fifth Causes of Action may also be dismissed.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the defendant's motion for summary judgment (Dkt. No. 46) is **GRANTED**, and the plaintiff's complaint is **DISMISSED IN ITS ENTIRETY**, and it is

**ORDERED**, that the Clerk enter judgment for the **DEFENDANT**.

Dated: March 11, 2020

Andrew T. Baxter
_____
**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**